**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

IRENE R. DANIELLO,                                ::
                                                    :
                              Plaintiff,            :
                                                    :
            v.                                      :      Civ. No. 12-1023-GMS-MPT
                                                    :
CAROLYN COLVIN,                                    :
ACTING COMMISSIONER OF SOCIAL                      :
SECURITY,                                           :
                                                    :
                              Defendant.            :

**REPORT AND RECOMMENDATION**

**I.      INTRODUCTION**

On February 22, 2013, plaintiff Irene R. Daniello ("plaintiff") filed this action

against defendant Carolyn W. Colvin, Acting Commissioner of Social Security

("defendant").[1]  Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of a

decision by defendant denying her application for disability insurance benefits ("DIB")

under Title II of the Social Security Act.  Presently before the court are the parties'

cross-motions for summary judgment.  For the reasons set forth below, the court

recommends plaintiff's motion for summary judgment be denied, and that defendant's

cross-motion for summary judgment be granted.

**II.     BACKGROUND**

        **A.      Procedural History**

---

[1]Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P"), Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case.

On July 14, 2006, plaintiff applied for DIB.  Plaintiff alleged her disability began July 7, 2006 due to mild scoliosis, herniated discs, and a recent heart attack with stent placement.  Her claim was initially denied on July 6, 2007, and upon reconsideration on September 13, 2007.  Plaintiff subsequently filed a written request for a hearing on September 18, 2007.  A hearing before Administrative Law Judge ("ALJ") Edward J. Banas was conducted on June 26, 2008.[2]  Plaintiff, represented by counsel, testified at the hearing.  Also appearing and testifying was Diana Sims, an impartial vocational expert, as well as plaintiff's husband and sister.  After plaintiff raised previously a undisclosed claim of depression, the ALJ ordered she undergo a psychological exam following the hearing.  This consultative examination was conducted by psychologist, Joseph Keyes, Ph.D, on July 25, 2008.[3]

A supplemental hearing was conducted by ALJ Banas on January 8, 2009.[4] During this hearing, impartial medical expert, Hillel Raclaw, Ph.D, testified via telephone.  Plaintiff and her husband also testified.  Thereafter, plaintiff's attorney submitted written interrogatories for Dr. Keyes to clarify his report, which were answered on February 18, 2009, and the record was closed.[5]  On March 27, 2009, the ALJ denied her claims, finding plaintiff was not considered disabled under sections 216(I) and 223(d) of the Social Security Act.[6]  The ALJ determined that after consideration of the entire record, plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except that she occasionally needed to change

---

[2] D.I. 10 at 31-70.
[3] D.I. 11 at 684-93.
[4] D.I. 10 at 71-88.
[5] D.I. 11 at 750-55.
[6] D.I. 10 at 136-52.

positions, and is limited to simple, routine work due to pain and depression.[7]

Plaintiff filed a request for review of that decision, which was granted by the Appeals Council on November 23, 2009.[8]  The hearing was originally scheduled for August 11, 2010, but did not proceed as plaintiff objected to the medical advisor testifying by phone during the hearing.[9]  The hearing before ALJ Banas occurred on November 4, 2010.[10]  Present at the hearing were plaintiff and her counsel, Sims, and the medical expert, Dr. Raclaw, who was permitted to testify by telephone over plaintiff's objection.

On December 16, 2010, the ALJ issued a written decision denying plaintiff's application for DIB.  Specifically, the ALJ found that while her medically determinable impairments could reasonably produce the alleged symptoms, plaintiff's statements regarding their intensity, persistence and limiting effects were not credible to the extent that they were inconsistent with the residual functioning capacity assessment.[11]  As a result, the ALJ held plaintiff was not disabled under sections 216(I) and 223(d) of the Social Security Act.

Plaintiff's subsequent appeal to the Appeals Council was denied on June 12, 2012.  Consequently, the December 16, 2010 ALJ decision is the final decision of the Commissioner.  Seeking judicial review of this decision, on February 22, 2013, plaintiff moved for summary judgment in the District Court of Delaware.  Defendant filed a cross-motion for summary judgment.

---

[7] *Id.* at 144.
[8] D.I. 10 at 153-57.
[9] *Id.* at 89-93.
[10] *Id.* at 94-133.
[11] *Id.* at 16.

**B.      Plaintiff's Medical History, Condition and Treatment**

Plaintiff was thirty-seven years old at the time of the November 4, 2010 hearing.

She alleges disability began July 2006, when she was thirty-two years old.  She is a

high school graduate with prior vocational experience as a waitress, cashier and retail

price accuracy team member.  Most recently, plaintiff worked part-time at Target

through October 2010.  Her detailed medical history is contained in the record; however,

this recommendation will provide a brief summary of the pertinent evidence.

Specifically, the recommendation will address the relevant medical history and evidence

regarding plaintiff's physical ability to do work in relation to her heart and back

conditions, as well as in regard to her mental state.

**1.      Plaintiff's Physical Ability to Do Work**

**a.      Plaintiff's Heart Attack and Cardiac Condition**

Plaintiff was admitted to the hospital on July 8, 2006[12], complaining of chest

pains.  Treating physicians concluded she had suffered a myocardial infarction, related

to smoking and use of oral contraceptives.[13]  A catheterization confirmed coronary

artery disease with 90% stenosis of the LAD and a 25% ejection fraction with ischemic

cardiomyopathy.[14]  Plaintiff underwent a thrombectomy and stenting, and was released

after a few days.[15]  She returned to work in August 2006, roughly one month after her

heart attack.[16]  Records from her cardiologist, Dr. Ramos, indicate she underwent

---

[12] D.I. 11 at 536-38.
[13] *Id.* at 538.
[14] *Id.* at 539.
[15] D.I. 10 at 142.
[16] *Id.* at 43.

cardiac rehabilitation.[17]  On November 8, 2006, Dr. Ramos noted plaintiff was "doing

very well from the cardiac standpoint."[18]  In February 2007, plaintiff told Dr. Ramos that

as a result of occasional of chest discomfort while at work, she reduced her work hours

and had no further discomfort.[19]  Dr. Ramos' notes reflect that by August 2007 plaintiff

returned to smoking, despite his repeated warnings to quit.[20]

On January 29, 2008, Dr. Ramos reported plaintiff was doing "pretty well from a

cardiac standpoint," and she could perform her usual activities without difficulty.[21]  Dr.

Ramos' treatment records show he did not impose any exertional restrictions.[22]  Follow-

up testing in May 2008 was normal, as the echocardiogram revealed an ejection fraction

of 35 to 40%, and a stress test showed no evidence of ischemia.  Plaintiff's medical

records show normal blood pressure readings.  Plaintiff continues to be seen by Dr.

Ramos for follow-up care.  Most recently, in the May 24, 2010 follow-up visit note, Dr.

Ramos stated plaintiff was doing "fairly well from a cardiac standpoint since I last saw

her 10 months ago."[23]  He noted plaintiff presented at the emergency room with atypical

chest pain, which was determined to be non-cardiac related.  Although plaintiff

continues to smoke, she denied any further chest pain or cardiac symptoms.  A stress

test was negative for ischemia.[24]

### b.    Plaintiff's Back Condition

---

[17] D.I. 11 at 805.
[18] *Id.* at 805.
[19] *Id.* at 808.
[20] *Id.* at 810-811.
[21] *Id.* at 813.
[22] *Id.* at 804-860.
[23] *Id.* at 952.
[24] *Id.* at 954.

In her records with Social Security, plaintiff advised she has experienced back pain since the birth of her last child in 2005,[25] and has undergone several MRI's and x-rays to determine the source of the pain.  A lumbar spine MRI conducted on June 21, 2006 showed degenerative disc disease from L3-L4 through L5-S1, most significantly involving the L5-S1 level with mild disc bulges and spondylotic changes, with a small central disc herniation at L3-4.[26]  The MRI also suggested a tear of the annulus fibrosis at L4-5, and a left paracentral disc herniation at L5-S1.  On July 3, 2006, pain management and rehabilitative specialist, Irene Mavrakakis, M.D., concluded the MRI indicated probable mild scoliosis, but no neurological changes.[27]  A June 29, 2006 lumbosacral spine x-ray showed degenerative disc disease at L5-S1; the results, however, were unremarkable.[28]

Plaintiff's first documented visit to Dr. Mavrakakis occurred on July 3, 2006. Plaintiff told Dr. Mavrakakis that she was "doing well until recently," and rated her lower back pain seven out of ten on the visual analog scale ("VAS").[29]  Dr. Mavrakakis diagnosed chronic lower back and lower extremity pain secondary to lumbar radiculitis, concurrent sacroiliac syndrome, and myofascial pain, with no evidence of weakness, numbness or bowel or bladder dysfunction.  Dr. Mavrakakis' progress note, however, indicated "low back pain and left leg pain," as well as increased "lower extremity pain secondary to lumbar radiculitis," but also advised plaintiff "denies leg pain."[30]  Dr.

---

[25] D.I. 10 at 124.
[26] D.I. 11 at 526-27, 861.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* at 526-27, 861-62.

6

Mavrakakis continued plaintiff on Celebrex, Darvocet and other medications, and did not prescribe any additional medications.  She told plaintiff to continue with home exercises, and avoid exacerbating activities.  Also discussed was a possible MRI, and a different work environment.  Dr. Mavrakakis offered a surgical evaluation, but plaintiff declined.[31]

A diagnostic imaging report dated May 25, 2007 revealed five lumbar spine films showed normal alignment of the lumbar vertebrae,[32] with the disc spaces well maintained.[33]  Subtle left convex scoliosis was evident, with no bony destruction or fracture.  A follow-up MRI on June 14, 2007 indicated similar results to the June 2006 MRI, including a small midline L3-4 disc herniation and annular tear, a tiny annular tear and central disc herniation at L4-5, and a L5-S1 bulge which mildly encroached on the left neuroframen.[34]

On July 3, 2007, state agency physician Michael Borek, D.O., completed a physical residual functional capacity ("RFC") assessment of plaintiff.[35]  Dr. Borek determined plaintiff was able to occasionally lift up to twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of six hours in an eight-hour work day, and her ability to push and/or pull was unlimited, other than restrictions for lifting and/or carrying.[36]  He felt plaintiff was fairly credible.  He concluded her condition was severe, but had not lasted twelve months.  As a result, he found plaintiff sufficiently improved to do sedentary work in light of her back problems.  He further noted there

---

[31] *Id.* 862.
[32] *Id.* at 610.
[33] *Id.*
[34] *Id.* at 528-29; D.I. 17 at 8.
[35] D.I. 11 at 611-17.
[36] *Id.* at 612.

was limited medical evidence of record ("MER") to establish the severity of back pain.[37]

Dr. Borek's assessment was confirmed in a subsequent medical evaluation by state agency cardiologist, Carl Bancoff, M.D., on September 10, 2007, who found plaintiff could perform a modified range of medium work.[38] An additional medical evaluation conducted by state agency physician, Gurcharan Singh, M.D., on September 10, 2007, stated plaintiff's condition changed from July 23, 2007 with increased back pain and limited ability despite mediation.[39] Dr. Singh concluded the latest note from Pain Treatment and Rehabilitation dated May 27, 2007, revealed moderate right sacroiliac joint and midline lumbar tenderness. Patrick's testing produced right and left SI joint area pain. Plaintiff had no neurological changes.[40] He reviewed the medications related to her cardiac condition and noted "only muscle relaxant for lower back pain."[41] Dr. Singh agreed with Dr. Borek's July 3, 2007 RFC assessment.

Plaintiff underwent physical therapy with Edelman Physical Therapy from February 2, 2007 through April 26, 2007. After she stopped physical therapy, she was instructed to continue with at-home rehabilitative exercise. She initially informed Dr. Mavrakakis on September 25, 2007 that she completed the home exercises "as time allows."[42] She stated on December 20, 2007[43] that she did do the exercises, but by July 29, 2008, was no longer doing her home exercises.[44]

---

[37] *Id.* at 616.
[38] *Id.* at 646.
[39] *Id.* at 644.
[40] *Id.*
[41] *Id.*
[42] *Id.* at 696.
[43] *Id.* at 698.
[44] *Id.* at 877.

Plaintiff continued to visit Dr. Mavrakakis on a regular basis between July 2006 and October 2010. The record reflects that Dr. Mavrakakis' progress notes from July 3, 2006 to September 22, 2008[45] indicate little change in plaintiff's symptoms or examination findings. Plaintiff repeatedly complained of back pain. Dr. Mavrakakis' progress notes consistently diagnosed "chronic lower back and lower extremity pain secondary to lumbar radiculitis, concurrent sacroiliac syndrome and myofascial pain."[46] Beginning on May 22, 2007, Dr. Mavrakakis also assessed facet syndrome.[47] Examinations typically indicated "minimal" or "mild" sacroiliac joint tenderness with occasional "mild" lumbar spasm.

There are a few instances in which a specific incident triggered an increase in pain. For example, plaintiff complained of increased pain during a March 27, 2007 visit, after a long-distance car ride.[48] She advised during a visit on May 25, 2007 that she experienced increased pain following a slip on a wet bathroom floor,[49] as well as after playing with her children in July 2007.[50] During these exacerbations, Dr. Mavrakakis' findings increased to "moderate" tenderness. Plaintiff consistently denied any leg pain, weakness, numbness or bowel or bladder dysfunction.

As of July 25, 2007,[51] plaintiff also received pain medication injections from Dr. Mavrakakis, which she continues to receive intermittently. Throughout her treatment with Dr. Mavrakakis, plaintiff was prescribed numerous medications, including Flexeril,

---

[45] *Id.* at 861-88.
[46] *Id.*
[47] *Id.* at 872.
[48] *Id.* at 870.
[49] *Id.* at 873.
[50] *Id.* at 877.
[51] *Id.* at 620.

9

Neurontin, Celebrex, Skelaxin, Darvocet, the dosage and frequency for which varied over the four year time span of her alleged disability. Plaintiff did, however, consistently advise she improved while on medication, and denied any side effects.[52] Although plaintiff visited Dr. Mavrakakis monthly for prescription refills, she apparently never requested a referral. While Dr. Mavrakakis suggested a surgical consultation, plaintiff refused.[53] She confirmed during the June 26, 2008 hearing that she did not want surgery.[54]

On June 2, 2008, Dr. Mavrakakis completed a Medical Source Statement.[55] Therein she reported a diagnosis of lumbosocral spondylosis,[56] a diagnosis never previously described in her progress notes. In her report, Dr. Mavrakakis opined plaintiff could sit for a total of three hours during an eight hour work day,[57] and on a regular and continuing basis lift one to five pounds, occasionally lift six to ten pounds, and never lift over eleven pounds.[58] She indicated plaintiff could constantly balance, occasionally stoop, frequently perform postures of the neck, constantly engage in repetitive use of her hands, and required no assistive device for ambulating.[59] She concluded plaintiff would be absent, on average, two days per month due to her impairments.[60]

On May 8, 2009, plaintiff informed Dr. Mavrakakis that she was working four days

---

[52] *Id.* at 618-43, 647-57, 695-704, 713-22, 861-88, 906-25, 962-1001.
[53] *Id.* at 862.
[54] *Id.* at 40.
[55] *Id.* at 882-88.
[56] *Id.* at 882.
[57] *Id.* at 884.
[58] *Id.* at 886.
[59] *Id.* at 887.
[60] *Id.* at 888.

per week, eight hours per day which caused increased pain.[61]  She confirmed

medication provided pain relief.  At this time, she rated her pain as five out of ten, which

is considered a moderate level of pain or discomfort.  Dr. Mavrakakis suggested to

avoid exacerbating activities.  On June 17, 2009, plaintiff was given pain injections,

including at the left L5-S1 joint.

   Dr. Mavrakakis indicated in her February 8, 2010 progress note that plaintiff

suffered from sacroiliac syndrome and facet syndrome.[62]  A February 25, 2010 lumbar

spine x-ray demonstrated at the lumbosacral juncture avulsed versus unfused

spophysis at the inferior posterior aspect of L5.  Otherwise, the examination was

unremarkable, and commensurate with plaintiff's age with only mild degenerative

changes present.[63]  On March 2, 2010, an MRI showed no evidence of acute injury, but

indicated interval progression of degenerative disc disease, severe at L5/S1, with a

slight increase of the central and left lateral disc herniation, and mild central canal

stenosis with narrowing and encroachment of the left S1 nerve.  The MRI also revealed

an increase in the size of small disc herniations with annular fissuring, arthrosis of the

facet joints and hypertrophy of lumbar spine, as compared to the June 14, 2007 MRI.

   Dr. Mavrakakis referred plaintiff to Matthew Eppley, M.D., a neurosurgeon, who

examined plaintiff on April 13, 2010.  Dr. Eppley noted intact neurological findings, but

suggested possible spinal surgery.[64]  An April 22, 2010 MRI of the lumbar spine showed

posterocentral and left paracentral disc protrusion, impinging the left S1 nerve roots in

---

[61] *Id.* at 915.
[62] *Id.* at 906.
[63] *Id.* at 897
[64] D.I. 10 at 490.

the thecal sac, which had not significantly progressed.[65]   A May 2, 2010 cervical spine

x-ray showed no evidence of subluxation or prevertebral soft tissue swelling or

degenerative changes.[66]   A subsequent MRI conducted on May 4, 2010 revealed

degenerative disc disease at the L5/S1 level, normal disc spaces at the other levels,

and no acute osseous abnormality.[67]

Because of left sided facet tenderness during the May 10, 2010 examination, [68]

plaintiff received a L5-S1 facet joint injection on June 2, 2010.[69]   On July 26, 2010, she

told Dr. Mavrakakis that she was doing well, and rated her pain as five out of ten.[70]

During the August 27, 2010 visit, severe tenderness of the left sacroiliac joint and

lumbar spasm were reported by Dr. Mavrakakis.[71]   A September 8, 2010 lumbar

discogram showed pain at the L4-L5 disc level with a posterior annular tear, pain at the

L5-S1 disc level with diffuse internal disruption, and a normal study at the L3-L4 disc

spaces.[72]

As of the September 15, 2010 visit with Dr. Mavrakakis, plaintiff had been

prescribed Vicodin, Neurontin, Zocor, Plavix, Celexa, Ativan and Flexeril.[73]   During this

visit, Dr. Mavrakakis confronted plaintiff regarding her overuse of narcotics, threatened

to discharge her as a patient, and required her to attend drug counseling.[74]   Dr.

Mavrakakis recommended plaintiff seek less physical work and undergo vocational

---

[65] *Id.* at 485.
[66] D.I. 11 at 899.
[67] *Id.*
[68] *Id.* at 972.
[69] *Id.* at 970.
[70] *Id.* at 967.
[71] *Id.* at 966.
[72] *Id.* at 959.
[73] *Id.* at 964.
[74] *Id.*

rehabilitation.[75]  Plaintiff advised she intended to quit her present job because of pain.[76]

Dr. Mavrakakis prepared a Medical Source Statement detailing plaintiff's medical condition from July 2005 through August 31, 2010.[77]  Therein she reported plaintiff suffered daily from right low back pain, which increased by bending, lifting, pulling or pushing.  Dr. Mavrakakis noted positive objective signs, including reduced range of motion, abnormal posture in the lumbar area, tenderness, trigger points, muscle spasm and abnormal gait.[78]  She opined plaintiff could sit for a total of three hours during a eight hour work day, and would be absent from work twice a month.[79]  She further concluded plaintiff's conditions had not improved, and prevented her from working any longer than as indicated on the June 2, 2008 Medical Source Statement.[80]

## 2.    Plaintiff's Mental Ability To Work

Plaintiff did not initially allege any mental impairment or depression in her disability reports dated July 14, 2006, July 26, 2007, or September 25, 2007 or in her function report of July 14, 2006.[81]  In her initial July 2006 report, plaintiff did not check any boxes that her illness, injuries or conditions affected memory, task completion, concentration, understanding, following instructions, getting along with others or dealing with authority.[82]  She did, however, indicate in her 2007 report that "since the heart attack," she "did not handle stress well."[83]

---

[75] *Id.*
[76] *Id.*
[77] *Id.* at 945-51.
[78] *Id.* at 946.
[79] *Id.* at 948.
[80] *Id.* at 945.
[81] D.I. 10 at 349-58, 386-02, 396-401, 336-345.
[82] *Id.* at 343.
[83] *Id.* at 380.

During the June 26, 2008 hearing, plaintiff mentioned for the first time depression.[84]  She testified her depression began following the July 2006 heart attack.[85]  She never previously advised of her concerns about depression because she was "embarrassed."[86]  Dr. Mavrakakis' June 2008 Medical Source Statement, however, indicated plaintiff had no limitation in dealing with work stress.[87]  In light of plaintiff's allegations of depression, ALJ Banas ordered a psychological consultative evaluation.[88]

Plaintiff sought therapy with F.H. Evertt & Associates, Inc. in July 2008, and began seeing a licensed clinical social worker  ("LCSW").[89]  In her report, the LCSW concluded plaintiff had a major depressive disorder related to her heart condition and other health problems.[90]  Plaintiff's current Global Assessment Functioning ("GAF") was 48.[91]  The report noted that plaintiff was neat and casual, passively cooperative with normal eye contact, behaved in an anxious and guarded manner, had coherent speech and relevant content and normal productivity.[92]  The report concluded plaintiff's mood and affect was depressed, and she exercised fair to poor judgment regarding her depression.[93]  The report further provided plaintiff was alert, oriented, with intact attention and memory, average intelligence and adequate concentration, but because she could not spell a word backwards, concluded she had inadequate concentration.[94]

---

[84] *Id.* at 31-70.
[85] *Id.* at 52.
[86] Id.
[87] D.I. 11 at 678.
[88] D.I. 10 at 69.
[89] D.I. 11 at 935.
[90] *Id.* at 938.
[91] *Id.*
[92] *Id.* at 936.
[93] *Id.*
[94] *Id.* at 937.

Plaintiff attended 20 counseling sessions with Everett & Associates (later The Mind and Body Consortium) between July 1, 2008 and November 22, 2011,[95] and was prescribed medication for depression from her primary care physician.  Beginning on August 26, 2008, Dr. Mavrakakis also noted depression as treated by the plaintiff's primary care physician.[96]  Curiously, the record contains virtually no documentation regarding plaintiff's ongoing treatment from her primary care physician.[97]

Following the June 2008 hearing, plaintiff was examined by a psychologist, Joseph Keyes, Ph.D, on July 25, 2008,[98] who concluded her behavior was appropriate and not unusual, and her level of motor activity was within normal limits.  He found plaintiff's speech clear and easy to understand, her thinking clear, organized and relevant to the situational context, and her social and interpersonal skills appropriate, but limited.[99]  He concluded that based upon plaintiff's statements, she had moderate to severe symptoms of depression under the Beck Depression Inventory.[100]

Dr. Keyes rated plaintiff's degree of impairment regarding her ability to relate to other people as moderate, her restriction of daily activities as mild, with no deterioration of personal habits and moderate constriction of interests.[101]  Dr. Keyes attempted to assess plaintiff using the Minnesota Multiphasic Personality Inventory-2, but found plaintiff's clinical profile invalid since she responded in "an extremely exaggerated

---

[95] *Id.* at 931-44; *see also* D.I. 17 at 11.
[96] *Id.* at 878.
[97] D.I. 10; D.I. 11.
[98] D.I. 11 at 684-93.
[99] *Id.* at 684-87.
[100] *Id.*
[101] *Id.* at 692.

manner."[102]  Her GAF score was 60.[103]  In his Medical Source Statement, Dr. Keyes'

concluded plaintiff had no impairment understanding, remembering or carrying out

simple instructions, or making judgments regarding simple instructions.  She had mild

impairment understanding, remembering and carrying out complex instructions.[104]

Janis Chester, M.D. completed a mental health report on April 5, 2010.[105]  Dr.

Chester assessed a GAF score of 50.[106]  Dr. Chester's report noted plaintiff was well-

groomed, psychomotor retarded and soft-spoken,[107] described her mood as depressed,

her affect flat, with moderate impairment in relating to others, moderate restriction of

daily activities, no deterioration in personal habits, and no limitation in performing

complex, varied or repetitive tasks or following instructions.[108]

Plaintiff underwent a psychiatric medication evaluation on April 22, 2010,

conducted by nurse practitioner, Laura Hummel, at the Mind and Body Consortium.[109]

Hummel's report noted despite taking Celexa for a year, plaintiff felt the medication not

working.[110]  Hummel advised plaintiff to taper off Celexa and start Cymbalta.  She noted

that plaintiff's father-in-law passed away that week.[111]  Plaintiff reported low energy,

feeling depressed and useless, and easily upset.  Hummel found plaintiff manifested

normal behavior, displayed a well nourished physical condition, had fair rapport with

under productive speech, and demonstrated normal thought process, irritable mood,

---

[102] *Id.* at 686.
[103] *Id.* at 687.
[104] *Id.* at 689.
[105] *Id.* at 781.
[106] *Id.* at 783.
[107] *Id.*
[108] *Id.* at 784.
[109] *Id.* at 926-34.
[110] *Id.* at 926.
[111] *Id.*

congruent affect and intact memory, with fair judgment and insight.[112]  Her diagnosis

was major depression, with a GAF of 45.[113]

### C.   Hearing Testimony

A hearing was held on November 4, 2010 before ALJ Banas on remand from the

Appeals Council.[114]  Plaintiff appeared and testified at the hearing.  Vocational expert,

Diana C. Sims, also testified.  Hillel Raclaw, Ph.D., an impartial medical expert, testified

by telephone.  In response to plaintiff's objections to Dr. Raclaw's telephonic testimony,

the ALJ allowed her counsel to voir dire Dr. Raclaw, subsequently overruled his

objection, and made a formal ruling in his December 16, 2010 decision.[115]

### 1.   Testimony by Dr. Faclaw

Dr. Raclaw testified based on his review of the record.[116]  He treated evidence

from the registered nurse at Mind and Body Consortium as well as the notes from

Everett and Associates as highly suggestive lay evidence, which indicated nothing of

clinical significance until 2008.[117]  Regarding the period between the alleged onset date

and December 31, 2007, Dr. Raclaw testified that, in reference to any severe mental

medically determinable impairments, plaintiff's diagnosis was under 12.04, that is, a

depressive disorder.[118]  Dr. Raclaw noted other evidence, such as plaintiff's completion

of the July 14, 2006 and the July 23, 2006 disability reports,[119] did not indicate any

---

[112] *Id.* at 929.
[113] *Id.* at 930.
[114] D.I. 10 at 94-133.
[115] *Id.* at 19-20.
[116] *Id.* at 101.
[117] *Id.* at 104.
[118] *Id.* at 105.
[119] *Id.* at 346-48, 374-81.

emotional disturbances.[120]  He determined since plaintiff participated in normal daily activities, such as driving, shopping, cooking, cleaning, performing household chores, no specific mental issues were indicated.[121]

Dr. Raclaw testified that after 2008, plaintiff suffered from severe depression.  He stated the medical source data, "two CEs and Dr. Mavrakokis' comments" indicate "emotional issues" do not factor into plaintiff's pain.[122]  He concluded the record suggested plaintiff was capable of adjusting to occupational activity.  Dr. Raclaw noted that his opinion was supported by Dr. Keyes' assessment, which reiterated plaintiff "is able to transition from part-time work . . . to full-time work with no significant mental factors precluding that transition."[123]  Dr. Raclaw concluded the evaluation by Hummel was contradictory to plaintiff's claims of being essentially bedridden due to depression.[124]  In light of the record, Dr. Raclaw determined plaintiff evidenced no substantial limitations.[125]

### 2.    Testimony by Plaintiff

Plaintiff's testimony confirmed her education and previous work experience as a waitress, cashier and in retail.[126]  She stated she quit her job at Target a month prior to the hearing because of her cardiac condition, herniated disks and depression.[127] Because of the limitations imposed by her cardiologist, plaintiff claimed she could not

---

[120] *Id.*
[121] *Id.* at 106.
[122] *Id.* at 112.
[123] *Id.* at 113.
[124] D.I. 10 at 120.
[125] *Id.* at 113-114.
[126] *Id.* at 121.
[127] *Id.* at 123.

"run around" or "ride a bike or anything," and had to be careful climbing stairs due to shortness of breath, although she continued to smoke despite doctor's orders, and claimed her back problems, which started in 2005, continued to worsen.[128]  She testified her pain level remained constant, and for the past two years pain medication was ineffective.[129]  Plaintiff noted Dr. Eppley suggested surgery, but she had not discussed his suggestion with her cardiologist.[130]  She testified her pain did not decrease when she stopped work, and her depression had not improved in the past year.[131]  She further claimed she was unable to get out of bed "a few days per month", and had difficulty interacting with her children.[132]

### 3.    Testimony of the Vocational Expert

Diana Sims testified as the vocational expert.  Sims opined that pain and depression have a vocational impact if they are sufficiently severe to cause more than 12 to 15 days of lost work time per year, cause one to be less than 80 productive while on the job, or prevent doing simple, unskilled work.[133]  When asked what work a hypothetical individual with a high school education, having similar past work experience as plaintiff "despite what he or she may complain of," could be capable of performing, Sims stated that person could perform at a "sedentary, unskilled level," employed as a document preparer, such as a general office helper, for which regionally there are approximately 900 jobs and nationally approximately 375,000 positions.[134]  That

---

[128] *Id.* at 124.
[129] *Id.* at 125, 127.
[130] *Id.* at 127.
[131] *Id.* at 128.
[132] *Id.* at 129.
[133] *Id.* at 130.
[134] *Id.* at 131.

individual could also perform the job of a non postal mail sorter, where there are about 250 jobs regionally and in the national economy approximately 190,000 jobs. She testified her opinion was consistent with the Dictionary of Occupational Titles. Based on Dr. Mavrakakis' limitations for sitting, standing and walking, Sims concluded plaintiff could work part-time, but not full-time.[135]

### D.   The ALJ's Findings

Title II of the SSA, 42 U.S.C. § 423 (a) (1) (D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."[136] A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[137]

In *Plummer v. Apfel*, the Third Circuit outlined the appropriate test for determining whether a disability exists:

> In order to establish a disability under the SSA, a claimant must demonstrate there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." A claimant is considered unable to engage in any substantial activity only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.
>
> The Social Security Administration has promulgated regulations incorporating a sequential evaluation process for determining whether a

---

[135] *Id.* at 132.
[136] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[137] 42 U.S.C. § 423(d)(1)(A).

claimant is under a disability.  In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  If the claimant is found to be engaged in substantial activity, the disability claim will be denied.  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functioning capacity to perform her past relevant work.  The claimant bears the burden of demonstrating an inability to return to her past relevant work.[138]

If the ALJ determines that a claimant is either disabled or not disabled at any step in the

sequence, the analysis stops.[139]

Based on the factual evidence and testimony, the ALJ determined in his

December 16, 2010 opinion that plaintiff was not disabled; therefore, she was not

entitled to disability insurance benefits.[140]  The ALJ's finds are summarized as follows:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since July 7, 2007, the alleged onset date (20 CFR 404.1571).

3.    The claimant has the following severe impairments:  degenerative disc disease of the lumbar spine, hypertension, status post myocardial infarction, and depression (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and

---

[138] 186 F.3d 422, 427-28 (3d Cir. 1999).
[139] *See* 20 C.F.R. § 404.1520 (a) (2002).
[140] D.I. 10 at 23.

404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CRF 404.1567(a) with occasional changes in position, performing jobs which are simple and routine in nature with minimal public contact.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on October 16, 1973 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual function capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a "disability," as defined in the SSA, from July 7, 2006, through the date of this decision (20 CFR §§ 404.1520(g)).

## III.   JURISDICTION

A district court's jurisdiction to review an ALJ's decision regarding disability benefits is controlled by 42 U.S.C. § 405(g).  The statute provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain review of such decision by a civil action."[141]  The Commissioner's decision becomes final when the Appeals Counsel affirms an ALJ opinion, denies review of an ALJ decision, or when a claimant fails to pursue available

---

[141] 42 U.S.C. § 405(g)(2002).

administrative remedies.[142]   In the instant matter, the Commissioner's decision became final when the Appeals Counsel affirmed the ALJ's denial of benefits.   Thus, this court has jurisdiction to review the ALJ's decision.

## IV.   STANDARD OF REVIEW

A district court's review of the Commissioner's decision is limited to whether that decision is supported by substantial evidence.[143]   If the decision is supported by substantial evidence, then the court is bound by the factual findings therein.[144]   The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive."[145]   Substantial evidence has been defined as less than a preponderance, but "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[146]   "'Substantial evidence . . . must do more than create a suspicion of the existence of a fact to be established . . . it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'"[147]   "Overall this test is deferential, and we grant similar deference to agency inferences from facts if those inferences are supported by substantial evidence, even where this court acting de novo might have reached a different result."[148]   Furthermore, "the

---

[142] *Aversa v. Secretary of Health & Human Services*, 672 F.Sup 775, 777 (D.N.J. 1987); *see also* 20 C.F.R. § 404.905 (2002).

[143] *Jesurum v. Sec'y of the United States Department of Health & Human Servs.*, 48 F.3d 114, 117 (3d. Cir. 1995) (citing *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d. Cir. 1988)); *see also* 42 U.S.C. § 405(g).

[144] *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).

[145] 42 U.S.C. § 405(g); 5 U.S.C. § 706(E); *see Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).

[146] *Ventura v. Shalala*, 55 F.3d 900, 901(3d. Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

[147] *Universal Camera Cor v. NLRB*, 340 U.S. 474, 477 (1951)(citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[148] *Monsour Med. Ctr.*, 806 F.2d at 1190.

23

evidence must be sufficient to support the conclusion of a reasonable person after considering the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding."[149]

Thus, "a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence."[150] "Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion."[151] Where, for example, countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain or mental disability, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[152] Despite the deference given to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence."[153]

This standard has also been embraced by the Supreme Court for determining the availability of summary judgment pursuant to Fed. R. Civ. Pro. 56.[154] "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between

---

[149] *Id.*
[150] *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000).
[151] *Id.*
[152] *Matullo v. Bowen*, 926 F.2d 240, 245 (3d. Cir. 1990); *see also Smith v. Califano*, 637 F.2d 968, 970 (3d. Cir. 1981).
[153] *Smith v. Califano*, 637 F.2d 968, 970 (3d. Cir. 1981).
[154] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-251 (1986); *see also Williams v. Apfel*, 2000 U.S. Dist. LEXIS 4888 at *17 (D. Del. March 30, 2000), *vacated by, Williams v. Apfel*, 2001 U.S. Dist. LEXIS 9048 (D. Del. March 30, 2001).

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."[155]  Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an [essential element] . . . on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of [that] . . . party's case necessarily renders all other facts immaterial."[156]

The party moving for summary judgment bears the burden of demonstrating there is no genuine issue of material fact,[157] by showing the court "that there is an absence of evidence to support the nonmoving party's case."[158]  On the other hand, "a party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"[159]

When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party drawing all reasonable inferences in that party's favor.[160]  The court should grant the motion "unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party."[161]

Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is

---

[155] *Anderson,* 477 U.S. at 247-48.
[156] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[157] *Id.* at 323.
[158] *Id.* at 325.
[159] *Id.* at 321 (citing *Catrett v. Johns-Manville Sales Cor*, 756 F.2d 181, 184 (1985)).
[160] *Anderson*, 477 U.S. at 255.
[161] *Id.* at 251.

necessarily justified or that the losing party waives judicial consideration and a determination whether genuine issues of material fact exist.[162]  Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[163]

## V.    DISCUSSION

After considering the record, the parties' submissions and arguments, and the applicable law, the court finds the ALJ's decision is supported by substantial evidence. First, the ALJ properly found plaintiff was not fully credible concerning her pain and limitation.  Second, the ALJ correctly reviewed all of the pertinent medical evidence. Third, the ALJ did not err by giving the opinion of plaintiff's doctor "some weight." Finally, the ALJ was justified in relying on the expert testimony of Dr. Raclaw regarding plaintiff's mental condition.  Consequently, there is substantial evidence to support the ALJ's determination that, based on the factual evidence and testimony, plaintiff was not disabled and not entitled to disability insurance benefits.

### A.    Plaintiff's Credibility

Plaintiff argues the ALJ erred in finding her testimony concerning her pain and limitations not fully credible.[164]  In evaluating symptoms, the ALJ must "consider all . . . symptoms, including pain."[165]  Also, the ALJ must determine whether such symptoms "can reasonably be accepted as consistent with the objective medical evidence and

---

[162] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[163] *Krups v. New Castle County*, 732 F. Sup 497, 505 (D. Del. 1990).
[164] D.I. 17 at 16-17; D.I. 22 at 1-2.
[165] 20 C.F.R. § 404.1529(a).

other evidence."[166]  As finder of fact, the ALJ is given considerable discretion in making

credibility findings.[167]  Once it is determined that an impairment "could reasonably be

expected to produce . . . symptoms, such as pain," its intensity and persistence must be

evaluated to determine the effect on the ability to work.[168]

Under this evaluation, a variety of factors are considered, such as: (1) "objective

medical evidence," (2) "daily activities," (3) "location, duration, frequency and intensity,"

(4) medication prescribed, including its effectiveness and side effects, (5) treatment, and

(6) other measures to relieve pain.[169]  Subjective complaints of pain which are

supported by medical evidence should be given great weight.[170]  Thus, the ALJ

"determine[s] the extent to which a claimant is accurately stating the degree of pain or

the extent to which he or she is disabled by it."[171]

Here, the ALJ found, although plaintiff's "medically determinable impairments

could reasonably . . . cause the alleged symptoms," her statements "concerning the

intensity, persistence and limiting effects of these symptoms are not credible" because

they were inconsistent with the residual functional capacity assessment."[172]  This

determination by the ALS that plaintiff's statements were only partially credible, is based

on substantial evidence in the record, as plaintiff's allegations of disabling limitations are

not fully consistent with her own statements as well as the objective medical evidence of

---

[166] *Smith v. Astrue*, No. 08-4634, 2009 WL 5126559, at *3 (3d Cir. 2009) (quoting 20 C.F.R. § 404.1529(a)).
[167] *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).
[168] 20 C.F.R. § 404.1529.
[169] 20 C.F.R. § 404.1529(c).
[170] *See Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984).
[171] *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).
[172] D.I. 10 at 16.

her treatment history.

First, the inconsistencies in plaintiff's testimony and statements demonstrate limited credibility.  Throughout the relevant period, plaintiff told Dr. Mavrakakis she was "overall improved,"[173] "doing okay,"[174] and "continues to have her good days and her bad days."[175]  During the hearing, though, she testified that a pain level of ten out of ten  was "pretty much constant."[176]  She continued that rarely did the pain subsided to the six or seven range,[177] and further represented that for the past year, the pain was never less than six.[178]  Such testimony, however, conflicts with the moderate and varied VAS pain assessments she repeatedly reported to Dr. Mavrakakis.  For example, while plaintiff indicated on March 3, 2010 her pain level was ten out of ten, on June 14, 2010 she rated her pain as three-four out of ten.[179]  Typically, she described her pain level in the range of three-five out of ten.  Moreover, plaintiff stated on October 7, 2010, less than a month before the hearing in question, that her pain was five out of ten.[180]

Second, plaintiff's testimony regarding the effectiveness of medication and treatment for pain reduction is also inconsistent with her statements to Dr. Mavrakakis, and this doctor's progress notes.  When asked about the effectiveness of the physical therapy, injections or pain medications, plaintiff responded that "they really haven't done anything, getting rid of the pain.[181]  Dr. Mavrakakis' notes, however, reveal plaintiff

---

[173] D.I. 11 at 649.
[174] *Id.* at 654.
[175] *Id.* at 657.
[176] D.I. 10 at 125.
[177] *Id.*
[178] D.I. 10 at 126.
[179] D.I. 11 at 969.
[180] *Id.* at 962.
[181] D.I. 10 at 127.

generally saw improvement through medications, physical therapy and injections, with intermittent exacerbations of lower back pain, usually due to a specific incident.[182] Throughout the entire period of treatment, plaintiff consistently reported to Dr. Mavrakakis that her current medications decreased the pain.[183]  Plaintiff described a similar improvement through injections and physical therapy.[184]  Such inconsistencies between plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms provide substantial evidence supporting the ALJ's determination regarding her limited credibility.

Finally, the ALJ correctly considered the objective medical evidence regarding plaintiff's treatment regimen in respect to her physical and mental limitations. Regarding her claims of severe back pain, the ALJ correctly noted the medical records reveal findings of mild to moderate lumbar tenderness and spasm and sacroiliac joint tenderness,.[185] including after specific incidents of exacerbation.

In terms of her mental impairments, the ALJ also considered the objective evidence and the treatment records.  Although plaintiff testified being bedridden a few times a month from depression, her statements were not supported by the objective evidence.[186]  As part of his exhaustive evaluation of all relevant medical evidence regarding depression, the ALJ relied on Dr. Raclaw's findings that objective evidence did not support plaintiff's alleged degree of functional incapacity,[187] such as her self-

---

[182] D.I. 11 at 962-1001.
[183] *Id.* at 649.
[184] *Id.* at 618-43, 647-57, 695-704, 713-22, 861-88, 906-25, 962-1001.
[185] D.I. 10 at 18.
[186] *Id.* at 129.
[187] *Id.* at 21.

reported daily activities of cooking, shopping, driving and personal hygiene care, and maintaining part-time employment for several years after the purported onset date until October 2010 shortly before the hearing.[188]

The ALJ also referenced Dr. Chester's finding that, although plaintiff had moderate limitations in her ability to relate to and perform work requiring frequent contact with others, her limitation was mild for work involving minimal contact with others.  She had no difficulties following directions or performing simple tasks.[189]  The ALJ accepted these findings to the extent they were consistent with the findings of Dr. Keyes and the mental status examinations performed at Everett & Associates and Mind and Body Consortium.[190]  The ALJ further relied on the findings of Hummel, whose evaluations observed plaintiff as fully oriented, with intact memory and normal concentration, attention, speech and thought process.[191]  Dr. Ramos also reported on May 24, 2010 that plaintiff had appropriate mood, memory and judgment.[192]  Because the ALJ properly relied on inconsistencies in plaintiff's testimony, her treatment regimen, objective medical evidence, and credible medical opinions, his determination that plaintiff was partially credible is supported by substantial evidence.

### B.    Evaluation of Medical Evidence

Plaintiff contends the ALJ did not review crucial medical evidence regarding her back impairment.[193]  Specifically, she asserts the ALJ failed to consider the February 8,

---

[188] *Id.*
[189] *Id.* at 20.
[190] *Id.* at 21.
[191] *Id.* at 17.
[192] *Id.*
[193] D.I. 17 at 14; D.I. 22 at 2-3.

2010 MRI, the discogram, or Dr. Eppley's suggestion for back surgery.[194]  The Third

Circuit has stated that "[a]lthough we do not expect the ALJ to make reference to every

relevant treatment note in a case where the claimant . . . has voluminous medical

records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical

evidence in the record consistent with his responsibilities under the regulations and

case law."[195]  Here, the ALJ thoroughly evaluated and discussed the relevant medical

evidence, and accounted for plaintiff's back impairment by assessing her residual

functional capacity to perform the modest demands of sedentary work with occasional

changes in position.[196]

        The ALJ expressly discussed the findings of the March 2010 MRI in the

decision,[197] concluding it revealed "no evidence of acute injury but interval progression

of degenerative disc disease, severe at L5/S1, with increase in size of moderate central

and left lateral disc herniation," and other conditions "causing mild central canal stenosis

with narrowing and encroachment of the left S1 nerve."  That same report indicated that

at the L3/L4 and L4/L5 levels, "an increase in the size of small disc herniations with

annular fissuring, arthrosis of the facet joints, and hypertrophy of the ligaments flava

causing mild central canal stenosis compared to the June 2007 MRI."[198]  The ALJ also

considered the May 4, 2010 lumbar spine x-ray.  While the ALJ did not specifically

address the April 30, 2010 lumbar spine MRI, such review was unnecessary since this

MRI concluded that the "overall appearance of the lumbar spine has not significantly

---

[194] *Id.* at 3.
[195] *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001).
[196] D.I. 10 at 15-22.
[197] *Id.* at 18
[198] *Id.*

changed," from the previous MRI.[199]  Because the findings in both MRIs were similar,

the April 2010 was not "particularly notable," and thus the ALJ did not fail to consider

relevant evidence.[200]

Regarding the September 8, 2010 lumbar discogram, the ALJ included an

extensive discussion of its findings in the decision.[201]  He noted the CT lumbar

discogram performed was "positive for concordant pain with Grade V annular tear at the

L5-S1 level, Grade IV annular tear at the L4-5 level, and Grade III annular tear at the

L3-4 level with concordant pain at the L4-5 and L5-S1 levels."[202]  Consequently, the ALJ

did properly evaluate and consider the discogram.

Concerning Dr. Eppley's opinion, the ALJ noted that plaintiff represented Dr.

Eppley recommended surgery as soon as possible.[203]  Her statements conflict with Dr.

Eppley's office examination notes, which indicate plaintiff "*may be* a decent candidate

for" surgery, but express concern regarding her cardiac history.[204]  Rather than

disregarding these findings, the ALJ recognized plaintiff had severe impairments,

including degenerative disc disease of the lumbar spine, but concluded she did not have

an impairment or combination of impairments that meet or medically equals those listed

in 20 CFR 404, Subpart P, Appendix 1.[205]  Therefore, the ALJ correctly considered,

discussed and weighed all probative evidence regarding plaintiff's back condition in his

---

[199] D.I. 11 at 905.
[200] *See Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record.").
[201] D.I. 10 at 19.
[202] *Id.*
[203] *Id.* at 16, 127.
[204] D.I. 11 at 896.
[205] *Id.* at 13.

determination of her residual functional capacity.

### C.    Treating Physician's Medical Opinion

Plaintiff asserts the ALJ erred by failing to give the opinion of plaintiff's treating

doctor controlling weight.[206]   An examining doctor's written report setting forth medical

findings in the doctor's area of competence "may constitute substantial evidence."[207]   In

determining the proper weight for such medical opinions, the ALJ is required to consider

all evidence and resolve any material conflicts.[208]   The Third Circuit has found "treating

physicians reports should be accorded great weight, especially 'when their opinions

reflect expert judgment based on a continuing observation of the patient's condition over

a prolonged period of time."[209]   A treating physician's opinion is "entitled to substantial

and at times even controlling weight."[210]   It is accorded "controlling weight" if it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the claimant's] record."[211]

It is error, however, to apply controlling weight to an opinion merely because it

comes from a treating source if it is not well-supported by the medical evidence, or if it is

inconsistent with other substantial evidence, medical or lay, in the record.[212]   Thus, the

ALJ may reject a treating physician's opinion if it is based on "contradictory medical

evidence."[213]   In those instances, "even where there is contradictory medical evidence,  .

---

[206] D.I. 17 at 15; D.I. 22 at 3.

[207] *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

[208] *Id.* at 399.

[209] *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 348, 350 (3d Cir. 1987)).

[210] *Fargnoli v. Halter*, 247 F.3d 34, 42 (3d Cir. 2001).

[211] *Id.* (quoting 20 C.F.R. 404.1527(d)(2)).

[212] SSR 96-2p.

[213] *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (citation omitted).

. . and an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must still carefully evaluate how much weight to give the treating physician's opinion."[214]  Further, "treating source medical opinions are still entitled to deference and must be weighted upon using all of the factors provided in 20 C.F.R. 404.1527 and 416.917."[215]

It is improper for an ALJ to disregard a treating physician's medical opinion based solely on his own impression of the record and evaluation of a claimant's credibility.[216]  Additionally, some explanation must be given "for a rejection of probative evidence which would suggest a contrary disposition."[217]  It may be appropriate to accept some evidence and reject the rest; however, all evidence must be considered and a reason for rejection must be provided.[218]

Under the Social Security Regulations, if an opinion is not given controlling weight, the ALJ must determine how much weight to give the opinion, citing specific reasons, and considering the following factors:  (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and

---

[214] *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008).
[215] Social Security Regulation ("S.S.R.") 96-2p, 1996 WL 374188 at *4.
[216] *See Morales,* 225 F.3d at 318 ("The ALJ cannot disregard [a treating physician's] medical opinion based solely on his own 'amorphous impressions, gleaned from the record and from his evaluation of [the claimant]'s credibility.").
[217] *Brewster*, 786 F.2d at 585.
[218] *See Stewart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983).

(6) other factors brought to the Secretary's attention which tend to support or contradicted the opinion.[219]

In the instant matter, the weight apportioned by the ALJ to Dr. Mavrakakis' opinion is based on substantial evidence in the record.  The ALJ assigned "some weight" to Dr. Mavrakakis' opinion, as discussed in the decision at issue, as well as the earlier March 27, 2009 decision that was incorporated by reference.[220]  The ALJ accepted Dr. Mavrakakis' assessment to the extent it was consistent with the residual functional capacity as determined for sedentary work with a sit/stand option.[221]  The ALJ found Dr. Mavravakis' June 2008 opinion that plaintiff could lift up to ten pounds was consistent with plaintiff's testimony, and supports a residual functioning capacity for sedentary work.[222]

Nevertheless, the ALJ rejected Dr. Mavrakakis' conclusion that the plaintiff is not able to sit, stand or walk more than three hours per day, since these findings were inconsistent with the treatment records.[223]  Dr. Mavrakakis' opinion is entitled to controlling weight if supported by medical evidence and consistent with the record.  In light of conflicting and other evidence, the ALJ was entitled to reject some of Dr. Mavrakakis' findings.[224]

First, Dr. Mavrakakis' opinion is inconsistent with other medical evidence of record.  Dr. Ramos' records show he did not impose any exertional  restrictions,[225] and

---

[219] 20 CFR 404.1527(d)(2); SSR 96-5p; SSR 96-2p.
[220] D.I. 10 at 21-22, 148-49.
[221] *Id.* at 21.
[222] *Id.* at 149.
[223] *Id.* at 21.
[224] *Id.* at 21-22, 149.
[225] D.I.11 at 804-860.

noted on September 22, 2008 that plaintiff "can perform her usual activities without discomfort."[226]  He also consistently documented only nonfocal neurological findings.[227]  Moreover, Dr. Eppley ascertained plaintiff had intact neurological findings.[228]

Dr. Mavrakakis' opinion also conflicts with the Physical Residual Functional Capacity Assessment completed by Dr. Borek on July 3, 2007.[229]  Dr. Borek concluded plaintiff was able to occasionally lift up to twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour work day, and her ability to push and/or pull was unlimited, other than restrictions for lifting and/or carrying.[230]  His opinion was affirmed by Dr. Singh in September 2007.[231]  Dr. Bancoff also indicated in September 2007 that claimant could lift up to 50 pounds occasionally 25 pounds frequently, and sit, or stand and walk six hours a day.[232]  The ALJ did not give significant weight to these opinions, since he found the medical evidence supported greater exertional limitations.[233]

Second, Dr. Mavrakakis' opinion is inconsistent with her own treatment history. Throughout her progress notes, the examinations never found more than mild to moderate back spasm and tenderness.[234]  Her notes indicate plaintiff reported increased back pain from standing all day at work, but she was not required to lift.[235]  On August 26, 2008, Dr. Mavrakakis stated plaintiff "noted that intensive physical activity worsens

---

[226] *Id.* at 747.
[227] *Id.* at 585, 587, 590, 605, 726, 731, 747, 800, 806, 810, 819, 864, 953.
[228] D.I. 10 at 490.
[229] D.I. 11 at 611-17.
[230] *Id.* at 612.
[231] *Id.* at 644.
[232] *Id.* at 646.
[233] D.I. 10 at 149.
[234] D.I. 11 at 618-43, 647-57, 695-704, 713-22, 861-88, 906-25, 962-1001.
[235] *Id.* at 652.

pain."[236]  She consistently recommended plaintiff "avoid exacerbating activities," but no specific restrictions are documented.[237]

Moreover, during her treatment of plaintiff, Dr. Mavrakakis consistently recorded plaintiff's self-assessment of pain was usually between three and five out of ten.[238]  Only occasionally were gait abnormalities documented.  After plaintiff fell and twisted her back, Dr. Mavrakakis noted on May 25, 2007 that her gait was "more antalgic."[239]  The progress reports indicate no trigger points, or clinical findings regarding weakness or loss of range of motion.  Finally, Dr. Mavrakakis' opinion that plaintiff must change positions every 15 minutes and cannot sit, stand or walk for more than a cumulative three hours daily is not supported by the record.  There were no other medical evaluations expressing a similar opinion, and plaintiff's work experience, which she stated included working "four days a week eight hour days sometimes"[240], contradicts this finding.

Third, Dr. Mavrakakis' opinion lacks supporting evidence.  When asked to identify any positive objective signs of plaintiff's impairment, Dr. Mavrakakis did not indicate on the August 31, 2010 Medical Source Statement that plaintiff had any sensory or reflex changes, muscle weakness or muscle atrophy.[241]  She failed to provide any explanation for her opinion that plaintiff's condition had not improved since the June 2, 2008 Medical Source Statement.  Instead, she simply stated "[plaintiff] has continued under my care

---

[236] *Id.* at 716.
[237] *Id.* at 618-43, 647-57, 695-704, 713-22, 861-88, 906-25, 962-1001.
[238] *Id.* at 618-43, 647-57, 695-704, 713-22, 861-88, 906-25, 962-1001.
[239] *Id.* at 627.
[240] *Id.* at 915, 990.
[241] *Id.* at 946.

on a regular basis and, unfortunately, her condition has not improved."[242]

Fourth, Dr. Mavrakakis' assessment is inconsistent with the relatively conservative degree of treatment prescribed.  While plaintiff visited Dr. Mavrakakis regularly, her progress notes suggest this frequency was necessary for plaintiff to obtain medications; in fact, her notes demonstrate the typical "Plan" focused primarily on prescription medications.  The record shows, and plaintiff admits,[243] that she became addicted to pain medications, motivating Dr. Mavrakakis to discontinue Vicodin on September 25, 2010.[244]  The only solution plaintiff sought for her pain was mediation; she never requested a referral to another speciality or for other treatment,[245] and declined Dr. Mavrakakis' initial suggestion for a surgical consultation.[246]  Dr. Mavrakakis eventually referred plaintiff to Dr. Eppley, a neurosurgeon, who examined plaintiff on April 13, 2010.  Despite noting intact neurological findings, he suggested possible spinal surgery.[247]

Finally, objective evidence regarding plaintiff's daily activities also tends to undermine Dr. Mavrakakis' assessment.  Plaintiff testified she worked part-time at Target until October 2010, albeit with assistance with lifting.[248]  While plaintiff testified her mother and sister assisted her, she was able to work on a part-time basis for over four years, and perform certain household chores.[249]

---

[242] *Id.* at 945.
[243] D.I. 17 at 9.
[244] *Id.* at 964.
[245] *Id.* at 618-43, 647-57, 695-704, 713-22, 861-88, 906-25, 962-1001.
[246] *Id.* at 862
[247] D.I. 10 at 490.
[248] *Id.* at 122-23.
[249] *Id.* at 39.

"In order to determine the proper weight to be given to a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts."[250]  Here, the ALJ thoroughly evaluated the record and Dr. Raclaw's testimony before concluding Dr. Mavrakakis' opinion was inconsistent with other evidence on record.[251]  Because the ALJ determined plaintiff's testimony and self-assessments lacked some credibility, and in turn, because Dr. Mavrakakis relied heavily upon subjective complaints to form her assessment, the ALJ was entitled to assign limited weight to Dr. Mavrakakis' opinion. Therefore, the ALJ satisfied his burden of conducting a thorough evaluation and providing appropriate explanations.

### D.      Reliance on Opinion of Dr. Raclaw

Plaintiff argues the ALJ erred by relying on the testimony of Dr. Raclaw.  The court finds substantial evidence supports the ALJ's assessment of this medical opinion evidence.  The ALJ found Dr. Raclaw's testimony as unbiased, well-reasoned and persuasive.[252]  Dr. Raclaw is a licensed clinical psychologist with extensive expertise in psychology, and is familiar with the disability determination requirements of the Social Security Act.[253]

While plaintiff contends that Dr. Raclaw never reviewed all of her medical data,[254] the hearing notice shows Dr. Raclaw was provided with most of the exhibits prior to the hearing.[255]  The current record indeed reflects a few additional pages were added

---

[250] *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 659 (D. Del. 2008); *see also Richardson v. Perales,* 402 U.S. 389, 399 (1971).
[251] *Id.* at 7-30.
[252] *Id.* at 19.
[253] *Id.* at 192-193.
[254] D.I. 17 at 18.
[255] D.I. 10 at 256.

subsequent to the hearing notice; two pages are administrative and contain no medical evidence,[256] and one is a generic internet printout of medical symptoms.[257]  The remaining documents are dated after the administrative hearing:  one is MRI results of December 3, 2010, which describes "no significant interval changes,"[258] while the other is a largely repetitive letter from an LCSW dated November 22, 2011.[259]  Consequently, Dr. Raclaw's testimony did envelope the entire record, and therefore, the ALJ's determination that Dr. Raclaw's opinion should be entitled to significant weight is supported by substantial evidence.

Plaintiff's also argue that Dr. Raclaw's testimony relied heavily on the report of Dr. Keyes, which she asserts is "especially troubling."[260]  As the ALJ correctly noted, however, Dr. Keyes opinion is entitled to considerable weight, as it is well supported by the evidence and consistent with the entire record.[261]  Dr. Keyes' assessment of plaintiff's functional abilities found plaintiff alert, with clear, organized and relevant speech and thinking skills,[262] and was substantiated by the LCSW who examined plaintiff on July 1, 2008.[263]  Dr. Keyes concluded that based upon plaintiff's statements, she suffered from moderate, chronic major depressive disorder,[264] but demonstrated only mild restriction of daily activities and moderate impairment in relating to others.[265]

Hummel also found in April 2010 that plaintiff had normal motor behavior, fair

---

[256] D.I. 11 at 1003, 1005.
[257] *Id.* at 1002.
[258] *Id.* at 1006.
[259] *Id.* at 1004.
[260] D.I. 17 at 18.
[261] D.I. 10 at 20.
[262] D.I. 11 at 685
[263] *Id.* at 706-09.
[264] *Id.* at 687.
[265] *Id.* at 692.

rapport, average intellect, fair insight and good remote memory.[266]  Finally, Dr. Chester

concluded in April 2010 that plaintiff exhibited, at most, moderate impairment.[267]

Consequently, the relevant medical evidence of the LCSW, nurse practitioner and

physicians all serve to reaffirm Dr. Keyes' assessment of plaintiff's functional capacity,

which supports Dr. Raclaw's findings as valid, and the ALJ's determination of Dr.

Raclaw's credibility.

Concerning plaintiff's accusation that the ALJ credited the testimony of Dr.

Raclaw over the GAF scores, the ALJ carefully considered the documented GAF scores

of each source.  Dr. Keyes assessed a score of 60.[268]  The ALJ acknowledged that Dr.

Chester's GAF score of 50 indicated severe symptoms.[269]  Dr. Raclaw noted, however,

his assessment was based on Dr. Chester's entire consultation report, which was

inconsistent with his GAF score.[270]  The ALJ acknowledged[271] the April 22, 2010 GAF

score by Hummel of 45, which is also indicative of severe symptoms.[272]

While the GAF assessments ranged from 45 to 60, these scores do not

necessarily correlate with a disability claimant's ability to work.[273]  Instead, the GAF

scale to be used by practitioners in making treatment decisions.[274]  Neither the Social

Security regulations nor case law require an ALJ to determine the extent of an

individual's mental impairment based solely on a GAF score.[275]  A GAF score does not

---

[266] *Id.* at 929-30.
[267] *Id.* at 784-85.
[268] *Id.* at 687.
[269] D.I. 10 at 21.
[270] *Id.* at 21; *see also* D.I. 11 at 781-785 Dr. Chester's Medical Health Report.
[271] D.I. 10 at 21.
[272] D.I. 11 at 930.
[273] *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).
[274] *Id.*
[275] *Id.*

have a direct correlation to the severity requirements in the Social Security mental disorder listing.[276]  Moreover, "a GAF score of 45, if credited, would not require a finding of disability."[277]  In the instant matter, the ALJ specifically addressed the GAF scores assessed by Dr. Chester and Hummel in the most recent decision, and the GAF score by the social worker in the March 2009 decision.[278]  While the ALJ noted that GAF scores may suggest serious symptoms or impairment in social or occupational functioning, there was substantial evidence supporting the ALJ's finding that the record did not support such limitations.[279]

Finally, in terms of the weight assigned to Hummel's assessment, under Social Security Rulings and Regulations, a nurse practitioner is considered a medical source who is not an "acceptable medical source" as defined at 20 CFR 404.1513(d) and SSR 06-03p.[280]  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an "'acceptable medical source' for this purpose."[281]  The ALJ was thus justified in affording her findings little weight.[282]  Hummel's initial evaluation occurred within a week of plaintiff's father-in-law dying.[283]  Her Mental Status Exam is consistent with the findings by Dr. Keyes and Dr. Chester showing no significant abnormalities.[284]  Moreover, Hummel's notes from August 19, 2010 show some improvement in plaintiff's

---

[276] *Gilroy v. Astrue*, 351 F. App'x. 714, 715 (3d Cir. 2009) (citing 66 Fed.Reg. 50764–5 (2000)).
[277] *Id.*
[278] D.I. 10 at 21, 150.
[279] *Id.* at 21
[280] *Id.* at 21
[281] SSR 06-03P (S.S.A Aug. 9, 2006).
[282] D.I. 10 at 21.
[283] D.I. 11 at 926.
[284] *Id.* at 684-93, 781-87.

condition.[285]  Finally, at each documented visit, Hummel did not record any additional

medical problems nor order any new medications.[286]  Consequently, the record provides

substantial evidence, including multiple objective appraisals of plaintiff's functional

ability, to support the ALJ's evaluation of the medical opinion evidence.

## VI.    ORDER AND RECOMMENDED DISPOSITION

For the reasons contained herein, I recommend that:

(1) Defendant's cross-motion for summary judgment (D.I. 18) be GRANTED.

(2) Plaintiff's motion for summary judgment (D.I. 16) be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),

Fed. R. Civ.  72(b)(1), and D.Del.LR 72.1.  The parties may serve and file specific

written objections within ten (10) days after being served with a copy of this Report and

Recommendation. Fed. R. Civ.  72(b).

The parties are directed to the Court's standing Order in Non-Pro Se matters for

Objections Filed under Fed. R. Civ.  72, dated November 16, 2009, a copy of which is

available on the Court's website, www.ded.uscourts.gov.

Date: June 3, 2013                              /s/   Mary Pat Thynge
                                                        UNITED STATES MAGISTRATE JUDGE

---

[285] *Id.* at 934.
[286] *Id.* 926-34.

43